Marsh am,
 
 Ch. J.
 

 after stating the facts of the case, delivered the opinion of the court as follows •
 

 
 *413
 
 « In support of the sentence of condemnation in this case, the captors contend,
 

 1. That the Claimant, Manuel Pinto, has neither made sufficient proof of his neutral character nor of his perty in the goods he claims.
 

 2. That by the treaty between Spain and the United States the. property of a Spanish subject in an enemy’s vessel is prize of war,
 

 3. That on the principles of reciprocity this property should be condemned.
 

 4».' That the conduct of Manuel Pinto and of the vessel has impressed a hostil» character on his property and on that of other Spaniards laden on board of the Nercide,
 

 1.. Manuel Pinto is admitted to be a native of Buenos Ayres, and to carry on trade at that place in connexion with his father and sister, who are his partners, and.who also reside at Buenos Ayres ; but it is .contended that he lias acquired a domicil in England, and with that dojmicil the English commercial character.
 

 Is the evidence in any degree doubtful on this point ? Baltaza Ximenes, Antonio Lynch, and Felix Lynch, three Spaniards; returning- with Pinto in the Nereide, all depose that Buenos Ayres.is the place,of his nativity . and of his permanent residence, and that he carries on trade at that place.
 

 In his test affidavit Manuel Pintó swears in the most explicit terms to the fact that Buenos Ayres is, and always has been the place of his permanent residence ; tliatffie carries on business there on account of himself, his father, and sister, and that he has been absent for temporary purposes only. His voyage to London, where he arrived in June, 1813, was for the purpose of purchasing a cargo for his trade at Buenos Ayres, and of establishing connexions in London for the purposes of his future trade at Buenos Ayres.
 

 This plain and direct testimony is opposed^
 

 
 *414
 
 1. By Jiis examination
 
 in preparatorio.
 

 In his answer to the first interrogatory he says that he was born at Buenos Ayres, that for seven years last past, he has lived and resided in England and Buenos Ayres,' that he now lives at Buenos Ayres, that he has generally lived there for thirty-five ycais last past, and lias been admitted a freeman of the new government.
 

 Whatever facility may be given to the acquisition of a-commercial donucil, it lias never heretofore been contended that a merchant having a .fixed residence, and carrying on business at the place of his birth, ácquires a foreign commercial character by occasional visits to a foreign country. Had the introduction of the words
 
 “ seven years last
 
 past” even not bé'en fully accounted for by reference to the interrogatory, those words could not have implied such a residence as would give a domicil. But they arc fully accounted for.
 

 In his answer to the 12th interrogatory he repeats that he is a Spanish American ; now lives and carries on trade at Buenos Ayres, and has generally resided there.
 

 2. The second piece of testimony relied on by the, counsel for the captors is the charter party. That instrument states Manuel Pinto to be of Buenos Ayres now residing in London.
 

 The charter party does not state him to have been formerly of Buenos Ayres, but to be, at its date, of Buenos Ayres. Nothing can be more obvious than that.the expression,
 
 now residing in
 
 London¿ could be intended to convey no other idea tiian that he was then personally in London/
 

 As little importance is attached to the covenant to receive the return cargo at the wharf in London. The performance of this duty by the consignee of the cargo as the agerit of Pinto, would be a complete execution of it.
 

 Had the English character been friendly and the Spanish hostile, it would have been a hardy attempt indeed in
 
 *415
 
 Mr; Pinto to found, on these circumstances, a claim'tó a domicil in England.
 

 The question respecting ownership of the goods ,is not so perfectly clear.
 

 The evidence of actual ownership, so far as the claim asserts property existing, at the time, in himself and partners, is involved in no uncertainty. The test affidavit annexed to the claim is full, explicit, and direct. It goes as far as a test affidavit can go in establishing the right which the claim asserts. All the documentary evidence, relating to this subject, corroborates this affidavit. The charter party shows an expectation that, of a freight of 7001. the goods of Mr. Pinto would pay 400i. The very circumstance that he chartered the whole vessel furnishes ^strong inducement to the opinion that a great part of her cargo would be his own.
 

 The witnesses examined
 
 in preparatorio,
 
 so far as they know any thing on the subject, all depose to his interest. William Puzey was clerk to Pinto, and he deposes to the interest of his employer, on the knowledge acquired in njaking out invoices and other papers belonging to the cargo. His belief too is, in some degree, founded on the character of Pinto in London, where lie was spoken óf as a man of great respectability and property j and from the anxiety he discovered for the safety of the property after the Ncreide was separated from her convoyé
 

 The bills of lading for that part of the cargo which is claimed by-Pinto, are filled up, many of them with his name, some to order, and the marginal letters in the manifest would also denote the property to be his; Where he claims a part of a parcel of goods the invoice is sometimes to order, and the marginal letters would indicate, the goods to be the property of Pinto and some other person.
 

 This testimony proves, very satisfactorily, the interest of Pinto’s house in the property he claims. There is jao counter testimony in the cause, excépt the belief expressed by Mr. Puzey, that for a part of the goods Pinto was agent for the government of Buenos Ayres,. This
 

 
 *416
 
 belief of Mr. Puzey is supposed to derive much weight from his character as the clerk of Mr. Pinto. The importance of that circumstance, however, is much diminishcd b'y the fact that he had seen Pinto only a week be-the sailing of the Nereide, and that he .does not declare his belief to be fdunded on any papers he had copied or seen; or on any communication made to him by. his employer. There are, other and obvious grounds for his suspicion. A part of the cargo consisted of arms and military accoutrements ; and it was not very surprising that Puzey should conjecture that they were purchased for a government about to sustain itself by the sword. But this suspicion is opposed by considerations of decisive influence, which have been stated at the bar. The demand for these articles in Buenos Ayrés by the government would furnish, sufficient motives' to a merchant for making them a part of his .cargo, in a considerable part of this .warlike, apparatus, British subjects were jointly concerned. It is extremely improbable, that, if acting for his government, he would have, associated its interests with those of British merchants. Nor can a motive be assigned for claiming those goods for himself instead of claiming them for his government* They would hot by such claim become his. if, restored. He would still remain' accountable to hiá government» and the truth would have protected the property as e£-. fectually ;as a falshood, should it remain undetected.. By claiming these goods for himself, instead of his government, he would commit a perjury from which he copld derive no possible advantage, and which would expose to imminent hazard, not only those goods but his whole interest in the cargo. The Court; therefore, mustconsider this belief of Mr.Puzey as a suspicion, which a full know!* . edge of the facts ought entirely to dissipate. If there Was nothing in the catíse but this suspicion, nr this belief of Mr.'Puzey, the court would not attach any importance to it. But Mr. Pinto himself .has, in Kis examination
 
 in
 
 preparatorio, been at least indiscreet in asserting claims not to be sustained; and in terms which do not exhibit the real fact in its triie shape, in his answer to the 12th interrogatory he says «And this « deponent also has one-fourth interest as owner -of « the following goods, &c. viz.lfí bales of merchandize,”' &c. In his claim he thus states the transaction under which his title to the one-fourth of these- goods ac
 
 *417
 
 orüed. He had agreed with certain persons in England to select for them a parcel of goods for the market of Buenos Ayres, of which he was to be the consignee, and which he would sell oh a commission of 10 per cent, on the amount of sales at Buenos Ayres. These goods were selected, purchased, and .consigned. to Manuel Pinto. The bills of lading were in his possession, and he considered his interest under this, contract as equal to one-fóurth of the value of the goods, « wherefore,” he says, «he did suppose that he was interested in the said goods and merchandize for himself, his father, and sister, and well entitled, as the owner thereof, or otherwise, to an. equal fourth part of the said goods, inasmuch as his commissions as aforesaid, would have been eqdal to such fourth.”
 

 It is impossible to justify this representation of. the fact. The reasoning might convince the witness, but the language he used was undoubtedly calculated tomisltíad the Court, and to extricate property to which the captors were clearly entitled, ' although the witness might think otherwise. Such misrepresentations .must be frowned on in a prize Court, and must involve a claim, otherwise unexceptionable, in doubt and danger; A witness ought never to swear to inferences without stating the' train of reasoning by. which his mind has been conducted to them. Prize Courts are necessarily watchful over subjects of this kind, and demand the utmost fairness in the conduct of Claimants. Yet prize Courts must distingnish between misrepresentations which may he ascribed to error of judgment; and. which ái‘e, as soon as possible, corrected by the party who has • made them, and wilful falsehoods which aré detected by the testimony of others, or confessed by the party whcii detection becomes inevitable. - In the iirst^ pase there may be cause for a critical and perhaps suspicious examination of the claim and of the testimony by whi<ii it is supported; but it would be harsh indeed to .condemn neutral property, in a case in which it was clearly proved to be neutral, for one false step, in some degree equivocal in its character, whicu was so soon corrected by the party making,it.' '
 

 The case of Mr. Paul’s printing press is still less dubious in its appearance. It would require a very critb
 
 *418
 
 cal investigation of the evidence to decide whether this press is stated in his answer to the 12th interrogatory to be his property or not.. Four presses are said m tnaf answer to belong to him; but he also says in his answer to another interrogatory^ perhaps the 26th, that Mr. Paul had one printing press on board. Whether there were five presses in the cargo, or only four, lias not been decided, .because the declaration made in his examination in
 
 preparatorio
 
 that one of ,the presses belonged to Mr. Paul proves unequivocally that the mistake, if he made one, was not fraudulent.
 

 That he should state as his, the properly which belonged to a house in Buenos Ayres, whose members all resided at the same-place, and of which he was the acting arid managing partner, was a circumstance which could not appear important to himself, and which was of no importance in the cause. These trivial and accidental inaccuracies are corrected in his claim and in his test affidavit. The Court does not think them of sufficient importance to work a confiscation of goods, of the real neutrality of which no serious doubt is entertained.
 

 2. Does the treaty between Spain and the United States subject the goods of either party, being neutral, to condemnation as enemy property, if found by'the other in the vessel of an enemy ? That treaty stipulates that neutral bottoms shall make neutral goods, hut contains no stipulation that enemy bottoms shall communicate the hostile character to the cargo. It is contended by the captots that the two principles are so completely identified that the stipulation of, the one necessarily includes the other.
 

 Let this proposition he examined.
 

 The rule that the goods of an enemy found in the vessel of a friend are prize of war, and that the goods of a friend found in- the vessel of an enemy are to be restored, is believed to be a part of the original law of nations, as generally, perhaps universally,' acknowledged. Certainly it has been fully and unequivocally recognized .by the United States. This rule is founded on the simple and intelligible principle that war gives a full right to capture the goods of an enemy, but gives no right t©
 
 *419
 
 capture the goods of a friend. In the practical application of this principle, so as to form the rule, the propositions that the neutral flag constitutes no protection to enemy property, and. that the belligerent flag communicates no hostile character to neutral property, are necessarily admitted. The character of the property, taken distinctly and separately from all other, considerations, depends in no degree upon the character of the. vehicle m which it is found.
 

 Many nations have believed it to be their interest tq vary this simple and natural principle of public law. They have changed it by convention between themselves as far as they have believed it to be for their advantage-to change-it. But unless there be something in the nature of the rule which renders its parts unsusceptible of division, nations must be capable of dividing it by express compact, and if they stipulate either that the neutral flag shall .cover enemy goods, or that the enemy flag shall infect friendly goods, there would, in reason, seem to be no necessity for implying a distinct stipulation not expressed by the parties. - Treaties are formed upon deliberate reflection. Diplomatic men read , the public treaties made by other nations and cannot be supposed either to omit or insert an article, common in public treaties, without being aware of the effect of such omission or insertion. ■ Neither the oné nor the other is to be ascribed to inattention. And if an omitted article,be not necessarily implied in'one which is inserted, the subject to which that article would apply remains under the ancient rule. That the stipulation of iminur, nity to enemy gop.ds in the bottoms of . one of the parties being neutral does not imply a surrender of the goods of that party being neutral, if found in the vessel of an enemy, is the proposition of the counsel for the Claimant, and he powerfully sustains that proposition by arguments arising from the nature of the two stipulations. . The agreement that neutral bottoms shall make neutral goods is, he very justly remarks, a concession made by the belligerent to the neutral. It enlarges the sphere of neutral commerce, and gives to the neutral flag a capacity not given to'it by the law of nations.
 

 The stipuiation.which subjects neutral property, found in the bottom of an enemy, to condemnation as prize of
 
 *420
 
 war, is a concession made by the neutral to the belligerent, It narrows the sphere of neutral commerce, and (ak' S from the neutral a privilege he possessed under the law of nations. The one may be, and often is, exchanged for tiie other. But it may be the interest and the will of both' parties to stipulate the one without the other,* and if it be their interest, or their will, what shall prevent its accomplishment ? A neutral may give some other compensation for the privilege of transporting enemy goods in safety, or both parties may find an interest in stipulating for this privilege, and neither may be disposed to make to, or require from,-the other the surrender of any right as its consideration. What shall restrain independent nations from making such a compact ? And how is their intention to be communicated to each other or to the world so properly as by the compact itself?
 

 If reason can furnish no evidence of the indissolubility of the two maxims, the supporters of that proposition will 'certainly derive no aid from the history of their progress from the first attempts at their introduction to the present moment.
 

 For a considerable length of time they were the companions of each other-^-not as one maxim consisting of a single indivisible principle, hut as two stipulations, the one; in the view of the parties, forming a natural and obvious consideration for the other. The celebrated compact termed the armed neutrality, attempted to effect-by. force a ,great revolution in the law of nations. The attempt failed, but it made a deep and lasting impression on public sentiment; The character of this effort has been accurately stated by the counsel for the Claimants. Its object was to" enlarge, and notin any . till ng to diminish the rights of neutrals. The;great powers, parties to this agreement, contended for the principle, that free ships should make free
 
 goods;
 
 but not for the converse maxim
 
 ;
 
 so far were they from supposing the one to follow as a corollary from the other, that the contrary opinion was openly -and distinctly avowed. The king of Prussia declared his expectation that in future neutral bottoms would protect the goods of an enemy, and that neutral goods would he safe in an enemy bottom. There is no reason to helieye that this opi
 
 *421
 
 nionv was not common to those powers who acceded to the principles of the armed, neutrality,
 

 From that epoch to the. present, in the various treaties, which have beet) formed, some contain no on the subject and consequently leave the ancient rule in full force. Some stipulate that the character of the cargo shall depend upon the flag, some that the neutral flag shall protect the goods of an enemy, some that the goods of a neutral in the vessel of a friend shall be prize of war, and some that the' goods-of an enemy in a neutral bottom shall be. safe, and that friendly goods in the bottom of an enemy shall also be safe. .
 

 This review which was taken with minute accuracy at the bar, certainly demonstratesihat in public opinion, no two principles are more distinct and independent of each other than the two which have been contended to be inseparable.
 

 Do the United States understand this subject differently from other nations ? It is certainly not from our treaties that this opiifion can be sustained. The United States have in some5-treaties stipulated for both principles, in some for one of them only, in some that neutral bottoms shall make neutral goods and that friendly goods shall be safe in the bottom of an enemy. , It is therefore clearly understood in the United States, so far as an opinion can be formed on tluir treaties, that the one principle is totally independent of the o.ther. They have stipulated expressly for their separation, and.they have sometimes stipulated for the one without the other.
 

 But in a correspondence,betweenthe secretary of state of the United States and the minister of the French republic in 1793, Prussia is enumerated among those nations with whom the United States had made a treaty adopting the entire principle that the character of the cargo should be determined by the character of the flag.
 

 Not being in possession of this correspondence the Court is unable to examine the construction it has received.- It has not deferred this opinion on that account, because the point in controversy at that time was the «bligation imposed on the United States to protect belli
 
 *422
 
 ge rent property in their vessels, not the liability of their property to capture if found in'tiie vessel of a beliige- , rent. To this point the \yhole .attention of the writer was directed, and it is hot" wonderful that in meniioning incidentally the treaty with Prussia which contains the principle that free bottoms h* free goods, it should have escaped his recollection that, it did not contain the ■ converse of the maxim. On the talents and virtues which adorned the cabinet of that day, on the patient fortitude with which it resisted the intemperate violence with which it was assailed, on the firmness with which it maintained, those principles which its sense of duty prescribed’, on the wisdom of the rules it adopted, no panegyric has been pronounced at the bar in which the best judgment of this Court does not concur. But this respectful defference may well comport with the opinion, that an argument incidentally brought forward by way of illustration, is not such full authority as a decision directly on the point might have been.
 

 3. The third point made by the captors is, that whatever construction might be put on or.r treaty with Sp.nn, considered as an inilependant measure, the ordinances «f that government would subject American property, under similar circumstances, to confiscation, and therefore the property, claimed by Spanish subjects in this case, ought to be condemed as prize of war.
 

 The ordinances themselves have not been produced, iior has the Court received such information respecting them as would enable it to decide certainly either on their permanent existence, or on their application to the United States'. But be this as it may, the Court is decidedly of opinion that reciprocating to the subjects of a nation, or retaliating on them, its unjust proceedings towards our citizens, is a political not a legal measure. It is for the consideration of the government not of its Courts. The degree and the kind of retaliation depend .entirely on considerations foreign to this tribunal. It may be the policy of the nation to avenge its wrongs in a manner having no affinity to the injury sustained, or it may be its policy to recede from its full rights and hot to avenge' them at all. It is not for its Courts to interfere with the proceedings of'the nation and to thwart its views. It is. not for us to depart from the beaten, track,
 
 *423
 
 prescribed for us, and to tread the devious and intricate path of politics. Even in the case of salvage, a case peculiarlj within the discretion of Courts, because no fixed .rule is prescribed by the law of nations, congress has not left it to this department to say whether the rule of reign nations shall be applied to them, bat has by. law applied that rule, if it be the will of the government to apply to Spain any rule respecting captures which Spain is supposed to apply to us, the government will manifest that will by passing an act for the purpose. Tili such am act be passed, the Court is bound by the la\v of nations which is a part of the law of the land.
 

 Thus far the opinion of the Court has been formed without much difficulty. Although the principles, §&- serted by the counsel, have been sustained on both sides ■with great strength of argument, they have been found on examination to be simple and clear in themselves. Stripped, of the imposing garb in which they have been presented to the Court, they have no intrinsic intricacy which should perplex the understanding.
 

 The remaining point is of. a different character. Belligerent rights and neutral privileges are set in array against each other. Their respective pretensions, if n.ot actually intermixed, come into close contact, and the line of partition is not so distinctly marked as to be clearly discernible. It is impossible to declare in favor .of either, without hearing, from the- other, objections which it is difficult to answer and arguments, which it isr not easy to refute. The Court has given to-this subject a patient investigation, and has endeavored to avail itself of all the aid w’hich has been furnished by the-bar. The result, if not completely satisfactory even to ourselves, is one from which it is believed we should not depart w'ere further time allowed for deliberation.
 

 4. Has the conduct ot Manuel Pinto and of- the . Nereid e been such as to impress the hostile character on that part of the cargo which was in fact neutral
 
 c
 

 In considering this question the-Court has examined separately the parts which compose it.
 

 The vessel was armed, was the property of an enemy,
 
 *424
 
 and made insistence. How do these facts affect the claim?
 

 Had the vessel been armed by Pinto, that fact would certainly have constituted an important feature in the case. But the Court can perceive no reason for believing she was armed by him. He chartered, it is true, the whole vessel, and that he might as rightfully do as contract for her
 
 partially;
 
 but there is no reason to believe that he was. instrumental in arming her. The owner stipulates that the Nercide « well manned, victu-
 
 “
 
 ailed, equipped, provided and furnished with all things «< needful for such a vessel,” shall be ready to tajee on board a cargo to be provided for her. The Nereide, then, was to be put, by the owner, in the condition in Which she was.to sail. In equipping her, whether with or without arms, Mr, Pinto was not concerned. It appears to have been entirely ánd exclusively the act of the belligerent owner.
 

 Whether the l’esistance, which was actually made, is in any degree imputable to Mr. Pinto, is a question of still more importance.
 

 It has been argued that he had the whole ship, and that, therefore, the resistance was his resistance.
 

 The whole evidence upon this point is to be found in the charter party, in the letter of instructions 10 the master, and in the answer of Pinto to- one of the interrogatories
 
 in preparatorio.
 

 The charter party evinces throughout that the ship remained under the entire direction of the owner, and tliat Pinto in no degree participated in the command of her. The owner appoints the master and simulates for every act to be performed by the ship, front the. date of the cl) after party to the termination of the voyage. In ho. one respect, except in lading the vessel, was Pinto to have any direction of her.
 

 The' letter of instructions to the toaster contains full directions !»!' the regulation of his conduct, without any other reference to Mr. Pinto than has been already stated. That reference shows a positive limitation of
 
 *425
 
 ' Ills power by the terms of the charter party. Conseqiiently he had no share in the government of the ship,
 

 the nereide* BENNETT, master.
 

 But Pinto says in his answer to the 6th interrogatory that ££ he had control of the said ship and
 

 Nothing can be more obvious. than that Pinto could understand himself as saying no more than that he had the control of the ship and cargo so far as respected her lading. A part of the cargo did not belong to him, and was not consigned to him. His control over the ship began and opded with putting the cargo on board.' He does not appear ever to have exercised any authority in the management, of the ship. So far from exorcising any during the battle-, he went into the cabin where he remained till the conflict was over. It is, then, most apparent that when Pinto said he had the control of the ship ami cargo, he us«d those terms in a limited sense. He used them in reference to the power of lading her* given him by the charter party.
 

 If, in this, the Court be correct, this cause is to be governed by the principles which would .apply to it had' the Nereide been a general ship.
 

 The next point to be considered is the right of a neutral to place his goods on board an armed belligerent merchantman.
 

 That a neutral may lawful! piit his goods on board a belligerent ship for conveyance on' the ocean, is universally recognized as the original rule of the law of nations. It is, as lias already been stated, founded on *he plain and simple principle that the property of a friend remains his property wherever it m
 
 :.y
 
 Le found. £i Since it is not,” says Vattel,£* the place where a thing is which determines the nature of that thing, but the character of the. person to whom it belongs, things belonging to neutral persons which happen to be in an enemy’s country, o" on board an enemy’s ships, are to be distinguished mom those winch belong to the enemy.”
 

 Bynkershoek lays down the same principles in terms equally
 
 explicit;
 
 and in terms entitled to the more consideration, because lie enters into the enquiry whether a
 
 *426
 
 knowledge of the hostile character of the vessel can ef~ feet the owner of the goods.
 

 The same principle is laid down by other writers on same, subject, and is believed to be contradicted by none. It is true there were some old ordinances of France declaring that a hostile vessel or cargo should expose both to condemnation. But those ordinances have never constituted a rule of public law.
 

 It is deemed oí much importance that the rule is universally laid down in terms which comprehend an armed as well as an unarmed
 
 vessel;
 
 and that armed vessels have never been excepted from it. Bynkershoek, in discussing a question suggesting an exception, with his mind directed to hostilities, does not hint that this privilege is confined to unarmed merchantmen.
 

 In point of fact, it is belibved that a belligerent merchant vessel rarely sails unarmed, so that tins excepr tion from the rule would be greater than the rule itself.At all events, the number of those who are armed and who sail under convoy, is too great not to have attracted the attention of writers on public law; and this exception to their broad general rule, if it existed, would certainly be found in some of their works. It would be strange if a rule laid down, with a view to war, in such broad terms as to have universal application, should be so construed as to exclude from its operation almost every case for which it purports to provide, and yet that not a
 
 dictum
 
 should be found in the books pointing to such construction.
 

 The antiquity of the rule is certainly not unworthy of consideration. It is to be traced back to the time when almost every merchantman was in a condition for self-defence, and the implements of war were so light and so cheap that scarcely any would sail without them.
 

 A belligerent has a perfect right to arm in liis own
 
 defence;
 
 and a neutral has a perfect right to. transport his goods in a belligerent vessel. These rights do not interfere with each other. The neutral has no control over the belligerent right to arm — ought he to be ae¿ countable for the exercise of it
 
 2
 

 
 *427
 
 By placing neutral property in a belligerent ship, that properly, according to the positive rules of law, does not cease to be neutral. Why should it be changed by the exercise of a belligerent right, universally acknowiedged and in common use when the rule was laid dpwri, and over which the neutral had no, control?
 

 The belligerent answers, that by arming his rights are impaired. By placing his goods under the guns of an enemy, the neutral lias taken part with the enemy and assumed the hostile character.
 

 Previous to that examination which the Court has been able to make of the reasoning by which this proposition is sustained, one remark will be made which applies, to a great part of it. The argument which, taken in its fair sense, would prove that it is unlawful to deposit goods for transportation in the vessel of am enemy generally, however imposing its form, must be unsound, because it is in contradiction to acknowledged
 

 It is said that by depositing goods on board an armed belligerent the right of search may be impaired, perhaps defeated.
 

 What is this right of search ? Is it a substantive and independent right wantonly, and in the pride of power, to vex and harrass neutral commerce, because there is a capacity to do so ? or to indulge the idle and mischievous curiosity, of looking into neutral trade ? or the assumption of a right to control it? If it be such a substantive and independent right, it would be better, -that cargoes should be inspected in port before the sailing of the vessel, or that belligerent licenses should be procured. But this is not its character.
 

 Belligerents have a full and perfect right to capture enemy goods and articles going to their enemy which are contraband of war. To the exercise of that right the right of search is essential. It is a mean justified by the end. It has been truely denominated a right growing out of, and ancillary to the greater right of capture. Where this greater right may be legally ex-*
 
 *428
 
 ercised without search* the right of search can never arise or.come into question.
 

 But it is sáid that the exercise of this right may be prevented by the inability of the party claiming it to captare the belligerent carrier of neutral property.
 

 And what injury results from this circumstance ? If the property be neutral, what mischief is done by its es, raping a search. In so doing there is no sin even as against the belligerent, if it can be effected by lawful means. The neutral cannot justify the use of force or fraud, but if by means, lawful in themselves, he can,escape. this vexatious procedure; he may certainly employ them.
 

 To the argument that by placing his goods in the vessel of an armed enemy, he connects himself with that. enemy and assumes the hostile character;,it is answer? ed that no such connexion exists.
 

 The object of the neutral is the transportation of his goods. His connexion with the vessel which transports them is the same, whether that vessel be armed or unarmed. The act of arming is not his — it is the act of a party who has a right so to do. He meddles not with the armament nor with the war. Whether his goods were on board or not, the vessel would be armed and would sail. His goods do not contribute to the armament further than the freight he pays, and freight he would pay were the vessel unarmed.
 

 It ¡s difficult to perceive in this argument any thing which does not also apply to an unarmed vessel. In both instances it is the right and the duty of the carrier to,avoid capture and to prevent a search. There is no difference except in the degree of capacity to carry this duty into effect. The argument would operate against the rule which permits the neutral merchant to employ
 
 a
 
 belligerent vesssel without imparting to his goods the belligerent character.
 

 The argument respecting resistance stands on the same ground with that which respects arming. Both, are lawful. Neither of them is chargeable to the goods
 
 *429
 
 or their owner, where he has taken no. part in it. They are incidents to tlie character of the vessel
 
 •,
 
 and may always occur where the carrier is belligerent.
 

 thE nereide, bennett, MASTER.
 

 It is remarkable that no express authority on side of this question car be found in the books. A few scanty materials, made up of inferences from cases depending on other principles, have been gleaned from the books and employed by both parties. They are certainly not decisive for or against either.
 

 The celebrated case of the Swedish convoy has been pressed into the service. But that case decided no more than this, that a neutral may arm, but cannot by forcé resist a search. The reasoning of the judge on that occasion would seem to indicate that the resistance condemned the cargo, because it was unlawful. It lias been inferred on the one side that the goods would be infected by the resistance of the ship, and on the other that a resistance which is lawful, and is not produced by the goods, will not change their character.
 

 The case of the Catharine Elizabeth approaches more nearly to that of the Nereide, because in that case as in this there were neutral goods and a belligerent vessel. It was certainly a case, not of resistance, but of an attempt by a part of the crew to seize the capturing vpsel. Between such an attempt and an attempt to take the same vessel previous to capture, there does not seem to be a total dissimilitude. But it is the reasoning of the judge and not Ms decision, of which thé Claimants? would avail themselves. He distinguishes between the effect which the employment of force by a. belligerent owner or by a neutral owner would have on. neutral goods. The first is lawful, the last unlawful. The belligerent owner violates no duty. Be is held by force and may escape if he can. From the marginal note it appears that the reporter understood this case to decide in principle that resistance by a belligerent vessel would not confiscate the cargo. It is. only in a case without express authority that such-materials can be relied on.
 

 If the neutral character of the goods is forfeited by. the resistance of the belligerent vessel, why is not the pputral character of the passengers forfeited by the same
 
 *430
 
 cause ? The master and crew are prisoners of war, why are not those passengers, who did not engage in the conflict also prisoners ? That they are not would seem to the Court to afford a strong argument in favor of the goods. The law would operate in the same manner on both.
 

 It cannot escape observation, that in argument the neutral freighter has been continually represented as arming the Nereide and impelling her to hostility. He is represented as. drawing forth and guiding her warlike energies. The Court does not so understand the case. The Nereide was armed, governed, and conducted by belligerents. "With her force, or her conduct the neutral Shippers had no Concern. They deposited their goods ;oh' board the vessel, and stipulated for their direct transT portation to Buenos Ayres. It is true that on her pas-, sage she had a right to defend herself, did defend herself, and might have captured an assailing 'vessel; but to search for the enemy would have been a violation of the charter party and of her duty.
 

 "With a pencil dipped in the most vivid colours, and guided by the hand of a master, a splendid portrait has been drawn exhibiting this vessel, and her freighter as forming a single figure, composed of the most , discordant materials, of peace and war. So exquisite was the skill of the artist, so dazzling, the garb in which the figure was presented, that it required the exercise of, that «void investigating faculty which ought always to belong to those who sit on this bench, to discover its only imperfection ; its want of resemblance.
 

 The Nereide has not that centaur-like appearance which lias been ascribed to her. She does not rove over the ocean hurling the thunders of war while sheltered by the’olive branch of peace. She is not composed in part of the neutral character of Mr. Pinto, and in part of the hostile character of her owner. She is an open and declared
 
 belligerent;
 
 claiming all the rights, and subject to all the dangers of the belligerent character. She conveys neutral property which does not engage in her warlike equipments, or in any employment she may make of them
 
 ;
 
 which is put on board solely for the purpose of transportation, and which encounters the hazard in
 
 *431
 
 cident to its situation ; the hazárd of being taken into -port, and obliged to seek another conveyance should its carrier be captured.
 

 In this it is the opinion of the majority of the there is nothing unlawful. The characters of the vessel and cargo remain as distinct in this as in. any other case. The sentence? therefore, of the Circuit Court must be reversed, and the property claimed by Manuel Pinto for himself and his partners, and for those other Spaniards for whom he has claimed, be restored, and the libel as to that property, be dismissed.
 

 Johnson,
 
 J.
 

 Circumstances, known to this Court, have imposed upon me, in a great measure, the responsibility of this decision. I approach the case with all the hesitation which respéct for the opinion of others and a conviction of the novelty and importance of some of the, questions are calculated to inspire. The same respect imposes upon me an obligation briefly to state the, course of reasoning by which I am led to my conclusion.
 

 On the minor points I feel no difficulty.. There is nothing to support the charge of English domiciliation ; the charges of prevarication are satisfactorily explained}; and ón the question of national character, we must yet awhile reluctantly yield to the acknowledgement that Buenos Ayres is not free. .
 

 On the construction of the Spanish treaty, I fed as little hesitation. That a stipulation calculated, solely- to produce an extension of neutral rights, should involve in itself a.restriction of neutral rights; that a mutual and gratuitous concession of a belligerent right,,should draw after it - a necessary relinquishment of a neutral. right, which hás never yielded but to express and (generally) extorted stipulation; are conclusions wholly irreconcilable’ to any priciple of logical deduction.
 

 Nor does the argument rounded on reciprocity stand on any better ground} There is a principle of reciprocity known to Courts administering inter-national law; but I trust it is a reciprocity of benevolence, and that the angry passions which produce revenge and retaliation will never exert their influence on the administration of
 
 *432
 
 justice. Dismal would be the state of the. world,' and melancholy the office of a judge, if all the evils which the perfidy and injustice of power inflict on individual man, were to be reflected from the tribunals which pro-peace and good will to all mankind. Nor is it easy to see how this principle of reciprocity, on the broad scale by which it has been protracted in this case, can be reconciled to the distribution of power made in our constitution among the three great departments of government. To the legislative power alone it must belong to determine when the violence of other nations is to be met by violence. To the judiciary, to administer law and justice
 
 as it is,
 
 not as it is made to be by the folly or caprice of other nations.
 

 The last question in the case is. the only one on which I feel the slightest difficulty.
 

 The general rule, the incontestible principle is, tl^at a neutral has. a right to employ a belligerent Carrier. He exposes himself thereby to capture and detention, but not to condemnation.
 

 To support the condemnation in this case, it is necessary to establish an exception to this rule; and it is itnportant to lay down the exceptions, contended for, with truth and precision. -
 

 In the first place, it is contended that a neutral has not a fight to transport his goods on board of an armed belligerent.
 

 Secondly, that if this right be conceded, Pinto, in. this case, has carried the exercise of it beyond the duties of fair
 
 neutrality;
 

 1. By laying the vessel under the obligation of a contract to sail with convoy :
 

 3. By chartering an entire armed vessel of the enemy, . and thus expediting an armed hostile force :
 

 3. By taking in enemy goods on freight, and thereby laying himself under an implied contract that the armament of the vessel should be used in its defence s
 

 
 *433
 
 4. It was also contended that he had, in fact, armed the vessel after chartering her, and increased her force by admitting passengers :
 

 5. That the correspondence, found on board, shews that the armament was immediately directed against capture by Americans.
 

 On the first and principal ground much may be said, but nothing added to the ingenious discussion which it has received from counsel.
 

 The question is, why may not a neutral transport his goods on board an armed belligerent? No writer on the law of nations has suggested this restriction on his rights ; and it can only be sustained on the- ground of its obstructing ihe exercise of some belligerent right. What belligerent right does it interfere with ? Not the right of search, for that has relation to the converse
 
 case;
 
 it is a right resulting from the right of capturing enemy’s goods in a neutral bottom.- It must be then the right, which every nation asserts, of being the sole arbiter of its own conduct towards other nations,■ and deciding for itself, whether property, claimed as neutral, be owned as'claimed. The question is thus fairly stated between the neutral and belligerent. On the one hand, the neutral claims the right of transporting his goods in the hostile bottom : On the other, the belligerent objects to his doing it under such circumstances as to impair his right of judging, between himself and the neutral,, on the neutrality of bis property and conduct. The evidence of authority, the practice of the world, and the reason and nature of things must decide between them.
 

 All these are, in my opinion, in favor of the neutral claim. .
 

 Every writer on inter-national law acknowledges the right of the neutral to transport his goods in a hostile bottom. No writer has restricted the exercise of that right to unarmed ships.
 

 Every civilized nation (with the exception of Spain) has unequivocally acknowledged the existence of this rigid, unless it be relinquished by express stipulation
 
 *434
 
 and, Even with regard to Spain, the evidence is wholly unsatisfactory to prove that she maintains a different doctrine. My present belief is, that she does not; but, admit that she ddes ; and surely the practice of one nation, and that one not the most enlightened or commercial, ought not to be permitted to control the law of the world.
 

 And what is the decision of reason on the merits of these conflicting pretensions ?
 

 Her first and favorite answer would be, that were the Scales equally suspended between the parties, the decision' ought to be given in favor of humanity;
 

 Already is the aspect of the world sufficiently, darkened by the liorrors of war. It is time to listen to the desponding claims of man engaged in the peaceful pursuits of life.
 

 But there are considerations in favor of. the neutral to which the heart need not assent
 
 •,
 
 they are addressed to the judgment alone.
 

 Admit the claim of the belligerent, and yon fritter away, the right of tlie neutral until it is attenuated to a vision.
 

 Admit the claim of the neutral and it is attended with a very immaterial change in the rights and interests of the belligerent.
 

 Where are we to draw the line? If a vessel is not to be armed, what is to amount to an exceptionable armament ? It extends to an absolute and total privation of the right of arming a hostile ship. Resistance, and even capture, is lawful to any belligerent that is attacked.
 

 On the other hand, what injury is done to the belligerent by recognizing the right of the neutral ? The cargo of a belligerent neither adds to nor diminishes his right to resist. If empty he must be .subdued before he Can be possessed ; and. if laden, the:,right or faculty, of resistance is in no wise increased. ' It is inherent ih her national character, and can be exercised by strict right, without any reference to the cargo that she con
 
 *435
 
 tains, Suppose tlie case of a vessel and cargo wholly neutral; even she possesses a natural right to resist seizure ; but her resistance must be effectual, or national law pronounces her forfeited. What injury re-, suits to the belligerent cruizer ? If the cargó be really neutral, the exercise of his right of judging becomes immaterial ; and if it be contraband, or otherwise subject to condemnation, what reason in nature can be assigned why the neutral owner should not throw himself upon the fortune of war, and rely upon the protection of your enemy ? You treat him as an enemy, if captured, and why should not he regard you.as an enemy, and provide for his defence against you ? Í can very well conceive that a case may occur in which it may become the policy, of this country to throw down the gauntlet to the world and'assert a different principle. But the policy of these States is submitted to the wisdom of the legisture, and I shall feel myself bound by other reasons until the constitutional power shall decide what modifications it will prescribe to the exercise of any acknowledged neutral right.
 

 The second ground of exception resolves itself into several points, and presents to my mind the greatest difficulties in the-case.
 

 1. There is á stipulation contained in the charter-party that the vessel shall sail with convoy.
 

 3. Pinto chartered the whole vessel.
 

 S.
 
 He
 
 took in
 
 sub-affreightment of hostile goods.
 

 4. It is contended he had contributed to the arming and manning of the vessel after chartering her.
 

 5. And that her equipment was pointedly against American capture.
 

 With regard to the two latter points I am of opinion that the evidence does not prove that Pinto contributed to tlie armament of the vessel; and if she was armed by the owners, that it was against American capture is immaterial. As to the passengers, Pinto had no control over the reception of them into the vessel. He had
 
 *436
 
 taken the hold and two births in the cabin; as to the residue it remained subject to the disposal ofthé captain or owner.
 

 With regard to the three other points, after the best consideration that I have been able to give the subject, I satisfy my mind by two considerations.
 

 1. I will not now give an opinion upon the abstract case of an individual
 
 neutral
 
 to all the world, it is known that Pinto was liable to capture both by the French and Carthagenians. This justified h:m in placing himself under British protection ; and if, in the exercise of this unquestionable right, he has incidentally impaired the exercise of our right of seizure for adjudicátion,“we have nothing to complain of. The case occurs daily ; and nothing but candor and fairness can be exacted of a neutral under such circumstances.
 

 2. There appears to prevail much misconception with regard to the control acquired by Pinto, in this vessel, under the charter party. His contract gave him the occupation of the hold of the vessel and two births in the cabin; but went, no farther. Over the conduct of the master and crew, in navigating or defending the vessel, it communicated to him no power. It is true that by the conduct of the master and the fate of the vessel, he might be incidentally affected as asub-freighter, and so far he had an interest in her defence; still, however, it is reducible to the general interest which he .had in the'performance of th.e voyage, and it. does not appear that he ever acted under an idea of being authorized to control the. conduct of the captain, or took any part in the conflict which preceded the capture.
 

 I am of opinion tnat the judgment should De reversed and the property restored.
 

 Stort,
 
 J.
 

 My opinion will he confined to the point last argued because it definitively disposes of the cause against the claim of Mr. Pinto.
 

 The facts material to this point are that Mr. Pinto chartered the Nereide, an uncommissioned armed ship belonging to British subjects, for. a voyage from London
 
 *437
 
 to Buenos Ayres, and back to London ata stipulated freight. The ship was to be navigated during the voyage at the expense of the general owner, who expressly covenanted, in the charter-party with Mr. Pinto, that she should sail on the voyage , under British Mr. Pinto, havingthushired the whole ship, took onboard, sundry shipments, partly on his own or Spanish account, and partly on account of British merchants from whom he was to receive, in lieu of freight, a portion of the profits and commissions. The Ncreide sailed with her cargo
 
 under British
 
 convoy, and with instructions from the owner to the master to govern himself, in relation to the objects of the charter-party, according to the direction of Mr. Pinto who accompanied the ship in the voyage. During the'passage to Buenos Ayres, the Ncreide was accidentally sep,¡rated from the convoy, and, while endeavoring to regain it, was, after a vigorous but unsuccessful resistance, captured by the privateer Governor Tompkins, and brought into New York for adjudication.
 

 It is explicitly asserted, in the testimony, that Mr. Pinto took no part in the resistance at the time of the capture.
 

 The question is, whether, upon these facts, Mr. Pinto, assuming him to he. a neutral, has so incorporated himself with the enemy interests as to forfeit that protection winch the neutral character would otherwise afford him.
 

 The general doctrine, though formerly subject to many learned doubts, is now im-^htrovertibly established, that neutral goods may be lawfully put on board of an enemy ship without being prize of war. As this doctrinéis asserted in the most broad and unqualified manner in publicists, it is thence attempted to be inferred, by the counsel for the ¡Claimant, that no distinction can exist whether the ship be armed or unarmed, or be captured with or without resistance — arguments of this sort are liable to many objections, and are in general wholly unsatisfactory. Elementary writers rarely explain the principles of public law with the minute distinctions which legal precision requires. Many of the most important doctrines of tiie prize Courts will not be found to be treated of, or even glanced at. in the elaborate treatises ofGrotius, or Puffendorf, or Vaftel. A striking illustration is their total silence as to the illegality and pe
 
 *438
 
 n al consequences of a trade with the’ public enemy. Even ÍSynkershoek, who writes professedly on prize law, is deficient in many important doctrines which every day regulate the decrees of prize tribunals. Amt the of modern commerce has added incalculably to the number as well as-the intricacy of questions of national law. In what publicist are to be found the doctrines as to the illegality of carrying enemy dispatches, and of engaging in the coasting, fishing or other privileged trade of. the enemy ? Where are transfers
 
 in. transitu
 
 pronounced to be illegal ? Where are accurately and systematically stated all the circumstances which impress upon the neutral a general, or a limited, hostile, character, cither by reason of his domicil,
 
 his territorial
 
 possessions, or his connexion in a house of trade, in the enemy country ? The search .would be nearly in vain in the celebrated Jurists whose'authority1 has been quoted, to silence, the present enquiry. Yet the argument would' be no less forcible that these doctrines have not a legal existence because not found in systematic treatises on the law, of. nations, than that which fías been so earnestly pressed upon us by the counsel for the Claimants. The assumed inference is then utterly inadmissible. .The question before the Court must be settled upon other grounds; upoir á just application of the principles which regulate neutrál, as well as belligerent, rights and duties, Let ns then proceed to consider them:—
 

 It is a clear maxim of national law that a neutral is hound to a perfect impartiality as to all the belligerents. If he.incorporatd himself into the measures or policy of either $ if he become auxiliary to the enterprizes or' acts of cither, he forfeits his neutral character — r-nop is this all. In relation to' his commerce he is hound to subr it to the belligerent right of search, and he cannot lawfully adopt any measures whose- direct object is to withdraw that commerce from the most liberal and accurate search without the application on.the part of the belligerent of supmor force. If he resist this exorcise of lawful right, or if, with a view' to resist it, he take the protection of án armed neutral convoy, he is 'treated as an enemy, 'and his'property is, confiscated. Ñor is it at all material whether the resistance be direct or constructive. The Resistance of the convoy is the resistance of all the ships associated under the common protection, without any
 
 *439
 
 distinction whether the convoy belong to the same or to a foreign, neutral sovereign — for upon th# principles of natural justice, a neutral is justly chargeable with the acts of the party, which' he voluntarily adopts, or, of which he seeks the shelter and protection,
 
 C(ui sentit commódum sentiré debet ct onus
 
 — these principles are. recognized in the memorable cases of the
 
 Maria, 1, Rob.
 
 340,
 
 and the Elsebe,
 
 5,
 
 Rob.
 
 173; and can never be shaken Without delivering over to endless controversy and conflict the maritime rights of the world.
 

 It has however been supposed, by the counsel of the Claimants, that á distinction exists between taking the protection of aneutral, and of a belligerent, convoy.' That in the former case all armament for resistance is unlawful ; but in the latter case it is not only lawful buf'm tito highest degree commendable. That although
 
 cm unlawfnl act,
 
 as resistance by a neutral convoy, mayjiistly affect the whole associated ships; yet it is otherwise"of' a
 
 lawful act,
 
 as resistance of a belligerent ship, for no foi'feiture .can reasonably grow out of such an act which is strictly justifiable.
 

 The fallacy of the argument consists in assuming the very grohnd in controversy; and in confounding things, in their own nature entirely distinct. An act perfectly lawful in a belligerent, may be flagrantly wrongful-j/i a neutral. A belligerent may lawfully resist search ; a neutral is hound to submit to it. A belligerent may carry on his commerce by force; a neutral cannot. -A belligerent may capture the property of his enemy on
 
 the
 
 occan; a neutral has no'autkorify whatever to make captures. The same" act, therefore, that, with reference to the rights and duties of the one, may be tortious, may, with reference to the rights and duties of the other, be perfectly justifiable.. The act then, as.to its character, is to be judged of, not merely by that of the parties, through whose immediate instrumentality it is done; but also by the character of those, who, having co-operated in, assented to, or sought protection from, it, would yet withdraw themselves from the penalties of the act. It is-analogous to the case "at common' law where an 'act, justifiable in one party, does not, from thatjfacfc-alone, shelter his coadjutor. They must stand or fall upon
 
 *440
 
 their own merits. It would be strange indeed, if, because a belligerent may kill his enemy,, a neutral may a¡d in the
 
 act;
 
 or because a belligerent may resist search, a neutral may co-operate to make it effectual. It is an assumption, utterly inadmissible,that aneutral can avail himself of the lawful act of an enemy to protect himself in an evasion of a clear belligerent right.
 

 And what reason can there be for the distinction con-fended fori Why is the resistance of the convoy deemed the resistance of the whole neutral associated ships, let them belong to whom they may ? it is not that there is. a direct and immediate co-operation in the resistance, because the case supposes the contrary, it is not that the resistance of the convoy of the sovereign is deemed an act to which all his own subjects consent, because' the ships of foreign subjects would then be exempted. ‘ it is because there is a constructive resistance resulting in Saw from the common association and voluntary protection against search under a full knowledge of the intentions of the convoy ? Then the.principle applies as well to a belligerent as to a neutral convoy ? For it is manifest that the belligerent will at all events resist search; and it is quite as manifest that. tiie neutral seeks belligerent protection with an intent to evade it. Is it that an evasion of search, by-the employment, protection, or, terror of force, is. inconsistent, with neutral duties? Then
 
 a fortiori
 
 the principle applies to a case of belligerent convoy, for the resistance musí be presumed to be more obstinate and the search more perilous.
 

 There can be but little doubt that it is upon the latter princ iples that the penalty of confiscation is applied to neutrals. The law proceeds yet farther and deems the sailing under convoy as an act
 
 per se
 
 inconsistent with neutrality, as a premeditated attempt to oppose, if practicable?, the right of search, and therefore attributes to such preliminary act, the full effect of actual resistance. In this respect it applies a rule analogous to that in cases of blockade, where the act of sailing with an intent, to break a blockade is deemed a sufficient breaclt to authorize confiscation. And sir W.. Scott manifestly recognizes the correctness of this doctrine in the Maria,
 
 *441
 
 ¡although the circumstances of that case did not require its rigorous application.
 

 Indeed, in relation to a neutral convoy, the" evidence of an intent to resist, as well as of constructive resistance, is far more equivocal than in case of a belligerent convoy. In the latter case it is necessarily known to the convoyed ships that the belligerent is bound to resist and will resist until overcome by superior force. It is impossible thei'efore tc join such convoy without an intention to receive the piotection of belligerent force in such manner and under such circumstances as the belligerent may choose to apply it. It is an adoption of his acts, and an assistance of his interests during the assumed voyage. To render the convoy an effectual protection, it is necessary to interchange signals and instructions, to communicate information, and to watch the approach of every enemy. The neutral solicitously aids and co-operates in all these important transactions, and thus far manifestly sides with the. belligerent and performs, as to him, a meritorious service — a service as little reconcileable with neutral duties, as the agency of a spy, or the fraud of a bearer of hostile dispatclxes. In respect to a neutral convoy the inference of constructive co-operation and hostility is far less certain and dix'ect. To condemn, in such case, is pushing the doctrine to a great extent, since it is acting upon the presumption, which is not permitted to be contradicted, that all the convoyed ships distinctly understood and adopted the objects of the convoy, and intimately blended their own interests with hostile resistance.
 

 There is not, then, the slightest reason for the favorable distinction, as to the belligei’ent convoy, assumed by-counsel. On the contrary, every presumption of hostility' is, in such case, more violent, and every suspicion of unneutral conduct more inflamed. And so in the argument of the
 
 Maña,
 
 1
 
 Rob.
 
 346, it was conceded by the counsel for the Claimants, and recognized by the Court. It was there said by counsel that it seemed admitted by the Court on a former day that there was a just distinction to be made between the two cases of convoy, viz: between the convoy of an enemy’s force, and a neutral
 
 convoy;
 
 that the former (i. e. enemy convoy) would stamp
 
 apriman/ character of hostility
 
 on all ships
 
 *442
 
 sailing under its’protection, and it would rest on the parties to take themselves out of the presumption raised against them; but that, even in that case, it would b<- nothing more than a presumption, which had been determined by a late case before the Lords,
 
 the Sampson,
 
 Barney, an' asserted American ship sailing with French cruizers at the time they engaged some English ships, and :ommunicating with the French ships by signal for battle. That, in that case, although there had been a condemnation in the Court below, the Lords sent it to farther proof to ascertain whether there, had’been an actual resistance. Sir Wm. Scott emphatically observed, « 1 do ,« not admit the authority of that case to the extent to «whichyoupush.it. That question is still reserved, « although the Lords might wish to know, as much Of « the facts as possible.” It is clear, from this language, that the learned judge did not admit that the party could be legally permitted to contradict the presumption of hostility attached to the sailing under an enemy convoy. On the contrary, he seemed to consider that the
 
 primary
 
 character of hostility, which, it was conceded, on all sides, was stamped upon such conduct, could hot Be permitted to be rebutted, but was conclusive upon the party. The case of the Sampson was originally heard before the Court of vice admiralty, and the decree of condemnation was never disapproved of, if not ultimately affirmed, by the Lords of Appeal. I have been assured by very respectable authority that no proof of actual resistance ever was, or could have been, made on the final hearing. The case, therefore, affords a strong inference of the law as understood and administered in the prize Courts of Great Britain.
 

 And it may be added, in corroboration, that in
 
 Smart v. Wolff, 3 T. R. 323, 332,
 
 sir
 
 W.
 
 Scott (then advocate general) asserted, without hesitation, that if the neutral refused search, or sailed under convoy of the enemy’s ships of war, or conveyed intelligence io the enemy, they are wavers of the rights of neutrality. The very circumstance of his putting these three cases in connexion to illustrate his general argument, affords the most cogent proof that he considered himself as stating a doc* tri ne equally clear and well established as to all of them.*
 

 
 *443
 
 And this doctrine seems conformable 'to the sense of other European sovereigns. In the recent cases of the American ships captured while under British convoy by the Danes, the right of condemnation was not only asserted and enforced by the highest tribunal of prize, but expressly affirmed by the Danish sovereign after an earnest appeal made bj' the government of the United States. On that occasion the Danish minister pressed the argument “that he who causes himself to be projected by that act, (i. e. enemy convoy), ranges him- “ self on .the side of the protector, and thus puts himself
 
 “
 
 in opposition to the enemy of the protector, and evi- « dently renounces the advantages attached to the cha-
 
 “
 
 racter of a friend to him against whom he seeks the « protection. If Denmark should abandon this princi- « pie, the navigators of ail nations would find their ac- « count in. carrying on the commerce of Great Britain,
 
 “
 
 under the protection of English ships of war without « any riskand he further declared that none of the « powers in Europe have called in question the justice « of this principle.” State papers, 1811, p.
 
 597.
 

 It cannot be denied that our own government have acquiesced in the truth and correctness of this statement. And if to the general silence of the other European sovereigns we add the possitive examples of Great Britain and Denmark, (the latter of whom has not of late years been deficient in zeal for neutral rights) it seems difficult to avoid the conclusion that the doctrine is as well founded in national law, as it seems to me to be in justice and sound policy.
 

 Another argument which has been urged in favor of the assumed distinction ought not, however, to be omitted. It is that a, party, neutral as to one power, may be
 
 *444
 
 an enemy as to another power, and he may lawfully place himself under belligerent convoy to escape from his own enemy. In such a predicament it is, therefore, always open to the neutral to explain his conduct in taking convoy, and to show, by proofs, his innocent intentions as to all friendly belligerents. In my judgment this supposed state of things would not remove a single difficulty.
 

 It is not in relation to enemies that the question as to taking convoy can ever arise. It has reference only to the rights of friendly belligerents; and these rights remain precisely the same whatever may be the peculiar situation of the neutral as to third parties. Was it ever héard of that a neutral might lawfully resist the right of search of one power, because he was at war with another ? And is not the evasion of this right just as injurious whether the neutral be afcqieace with all the world, or with a part only ?
 

 There would he extreme difficulty in establishing, by any disinterested testimony, the fact of any such special intentions as the argument supposes. Independent of this difficulty, it would, in effect, be an attempt to Tepel, by positive testimony, a conclusive inference of law flowing from the very act of taking convoy. The belligerent convoy is bound to resist all visitations by enemy ships, whether neutral to the convoyed ships or not. This obligation is distinctly known to the party taking its protection. If, therefore,' he choose to continue under the convoy, he shows an intention to avail himself of its protection under all the chances and hazards of war. The abandonment of such intention cannot ,be otherwise evidenbéd than by the overt act of quitting convoy. And it is impossible to conceive that the mere secret wishes or private declarations of a party coaid prevail over his own deliberate act of continuing under convoy, unless Courts of prize would surrender themselves to the most stale excuses and imbecile artifices. It would be in vain to administer justice in such Courts* if mere statements of intention would outweigh the legal effects of the acts of the parties. Besides, the injury to the friendly belligerent is equally great whatever might be the special objects of the neutral. The right of search is effectually prevented, by the presence of su
 
 *445
 
 penor force, or exercised only after the perils and itrjuries of victorious warfare. And it is this very evasion of the right of search that constitutes the ground of condemnation in ordinary cases. The neutral, in effect, declares that he will not submit to search until the my convoy is conquered, and then only because he cannot avoid it. The special intention of the neutral then could not, if proved, upon principle prevail, and it has not a shadow of authority to sustain it. The argument upon tin's point was urged in the Maria and Elsebe, and was instantly repelled by the Court.
 

 On the whole, on this point my judgment is, that the act of sailing under belligerent or neutral convoy is of itself a violation of neutrality, and the ship and cargo if caught in
 
 delicto
 
 are justly confiscable
 
 ;
 
 and further, that if resistance be necessary, as in my opinion it is not, to perfect the offence, still that the resistance of the convoy is to all purposes the resistance of the associated fleet. It might, with as much propriety, be maintained that neutral goods, guarded by a hostile army in their passage through a country, or . voluntarily lodged in a hostile fortress, for the avowed purpose of evading the municipal rights and regulations of that country, should not in case of capture be lawful plunder, (a pretension never yet asserted) as that neutral property on the oceán should enjoy the double protection of war and peace.
 

 If these principles be correct, it remains to be considered how far the conduct of Mr. Pinto brings him Within the range of their influence. It is clear that in the original concoction of the voyage it was his intention to avail himself of British convoy. The covenant in the charter party demonstrates this intention; a covenant, that, from its terms, being made
 
 by
 
 the ship owner, must have been inserted for the benefit and at the instance of the charterer. Under the faith of this stipulation Mr. Pinto put his own property on board and received shipments from persons of an ácknowledged hostile character. The ship sailed on the voyage, under British convoy, with Mr. Pinto on board, and though captured after a separation from the convoy, she was in the very attempt to rejoin it. There is no pretence, therefore, of an abandonment of the convoy, and the
 
 *446
 

 corpus
 
 delicti, the character of hostility, impressed by tiie sailing under convoy, if any attached, remained notwithstanding the separation. It is like the sailing for a blockaded port, where the offence continues, although at moment of capture the ship he, by stress of weather, driven in a direction from the port of destination / for the hostile intention still remains unchanged.
 

 And here to avoid the effect of the general doctrine, we are met with another distinction founded upon the supposed difference between a belligerent and a neutral merchant ship as to the taking of convoy. It is argued that the belligerent ship has an uhdoubted right to take the protection of the fconvoy of the nation to which she belongs; and that this extends a perfect and lawful immunity to the neutral cargo on board.
 

 It is certainly incumbent on the counsel for the Claimant to support this exception to the general rule by precedent or analogy. Nothing has been offered which, in my judgment, affords it the slightest support. It is not true that a neutral pan shelter his property from confiscation,behind an act lawful in a belligerent. The law imputes to the neutral the consequences of the act if he might have foreseen and guarded against it, or if lie voluntarily adopts it. Was it ever supposed that a neutral cargo was protected from seizure by going in a belligerent ship to a blockaded port ? or that contraband goods, belonging to a neutral, were exempted from confiscation because on board of such a ship “hound on a yoyage lawful to' the belligerent, but not to the
 
 neutrall
 
 •yet the pretensions in these cases seem scarcely more extravagant than that now urged. Why should a neu- , tral be permitted to do that indirectly which lie is prohibited ironi doing directly? Why should he aid the enemy by giving extraordinary freight for belligerent ships sailing under belligerent convoy with the avowed purpose .qf escaping from search, aqd often with the concealed intention of aiding belligerent commerce, and yet claim the benefits of the piost impartial conduct ? Until some more solid ground can be laid for the-distinction than the ingenuity of counsel has yet suggested, it would seem fit to declare
 
 ita lex non seripta est.
 

 But even if the distinction existed, it could not apply
 
 *447
 
 to the case at bar. This is a case where the' Claimant becomes the charterer of the whole vessel for the voyage and stipulates for the express benefit- of convoy, The ship, though navigated by a belligerent master and crew, was nécessarily under the control and manage-ment of the charterer. He was the real effective
 
 dux negotii. •
 
 Whatever tnay be the technical doctrine of the common or prize law as to the general property in the ship, the charterer was, to ali purposes, important in this enquiry, the owner for the voyage, and the master his agent. Can there' be a doubt that; as to the shipments of the enemy freighters, Mr. Pinto was responsible for the acts of the master ? Was he not materially interested in the safety and protection of’these shipments in respect to freight, commissions and profit's ? If they had been, lost by capture, from the negligence of Mr. Pinto or of the master, when by ordinary diligence and resistance the. loss might have been avoided, would not,Mr. Pinto have been responsible? How then it can be consistently held that the ship was not essentially governed and managed by Mr. Pinto, and all her conduct incorporated with his interests, I profess to be unable to comprehend. For what purpose should he insist on a covenant for convoy, if he never meant to derive aid and protection from it to the whole cargo on hoard, and to. range hknself and his interests on the side of resistance ? His private conduct at the time of the capture, when resistance was almost hopeless, affords no evidence to repel the irresistible presumptions -from his deliberate acts.
 

 And here again ft has been argued that Mr. Pinto had no hostile intentions against the United States; but that the taking of convoy was simply to resist the French and Carthagenians, who are the enemies of Ids own country, if such special intention could, in point, of law, uphold his claim which, for the reasons already stated, Í am. entirely satified it conld not, yet there is. not, in the present case, within my recollection, any proof of such special intention. It rests upon the mere suggestions of counsel. How, indeed, conld Mr. Pinto show that he meant to yield his property to the search
 
 ot
 
 the cruizers of the United States, when the deliberate act of assuming British convoy precluded the possibility of its exercise, unless acquired by victory after resistance ?
 

 
 *448
 
 If this view of the case be correct, it must be pronounced that Mr. Pinto, by voluntarily sailing under convoy, forfeited his.neutrality, and bound his property to an indissolubly hostile character.
 

 This, however, is not the only ground upon which the claim of Mr. Pinto ought to be repudiated. There was not merely the illegality of sailing .under enemy convoy up to the very eve of capture, but the fact bf actual resistance of the chartered ship, and submission to search only in consequence of superior force.
 

 An attempt,, however, is made to extract the case at bar, from the penalty of confiscation attached to resistance of search, upon the ground.that Mr. Pinto took no part in this resistance. It is asserted, that a shipper in a general ship is not affected by the act of the enemy master,- that the charterer of the whole ship is entitled lo as favorable a consideration ; and that there is no difference, in point of law, whether the ship have, or llave not a commission, or be, or be not armed. It will be necessary to give to these positions a full examination.
 

 In the first place, it is to be considered whether a neutral shipper has. a right to put his property on board of an armed belligerent ship without violating his neutral duties. If the doctrine already advanced on the subject of convoy be correct, it is incontcstiblc that he has no such right. If he cannot take, belligerent convoy,
 
 a fortiori
 
 he cannot put his property on hoard of such convoy j or, what is equivalent, on board of an armed and commissioned ship of the belligerent. What would be the consequences if neutrals might lawfully carry on all their commerce in the frigates and ships of war of another belligerent sovereign ? That there would be a perfect identity of interests and of objects, of assistance and o.f immunity,- between the parties. The most gross frauds and hostile enterprizes would be carried on under . neutral disguises, and the right of search would become as utterly insignificant in practice as if it were extinguished by the common consent of nations. The extravagant premiums and freights which, neutrals could well afford to pay for this extraordinary protection would enable the belligerent to keep up armaments of incalen
 
 *449
 
 {able size, to the dismay and ruin of inferior maritime powers. Such false and hollow neutrality would be infinitely more injurious than the most active warfare.; It would strip from the conqueror all the fruits of vietory, and lay them at the feet of those whose merit would consist in evading his rights, if not in collusively aiding his enemy. It is not therefore to be admitted that a neutral may lawfully place his goods under armed protection, on board of an enemy ship. Nor can it be at all material whether such armed ship be commissioned or not: that is an affair exclusively between a sovereign and his own subjects, but is utterly unimportant to the neutral. For whether thearmament be employed for offence, or for defence, in respect to third parties,the peril and the obstruction to thcright of search are equally complete. Nor is ittrue, as has been assertedin argument, that a non-commissioned armed Ship has jno right to capture an enemy ship, except in her own defence. The act of capture without such pretext, so far from being piracy, would be strictly justifiable upon the law of nations, however it might stand upon the municipal law of the country of the capturing ship. Vattel has been quoted to the
 
 contrary;
 
 but on a careful examination, it will be found that his text does not warrant the doctrine..
 

 I have had occasion to consider this point in another cause, in this Court, and to the opinion then delivered I refer for a more full discussion of it. If the subject capture without a commission, he can acquire no property to himself in the
 
 prize;
 
 and if the act be contrary to the regulations of his own soyereign, he may be liable to municipal penalties for his conduct. But as to the enemy he violates no rights by the capture. Such, on an accurate consideration, will be found to be the doctrine of Puffendorf, and Grotius, and Bynkershoek, and they stand confirmed by a memorable decision of the lords of appeal, in 1759. 2
 
 Brown’s civil and adm. app.
 
 524—
 
 Grotius lib.
 
 3,
 
 ch.
 
 6,
 
 s.
 
 8,
 
 9,10
 
 — and
 
 Barbeyrac's note on s.
 
 8,
 
 Puffendorf, lib.
 
 8,
 
 ch.
 
 6,
 
 s.
 
 21,
 
 Spc. Bynk.
 
 2,
 
 P. J. ch.
 
 3,4,16,17. 2
 
 TVoodes. led.
 
 432.
 
 Consol, del. Mare ch.
 
 287 288. 4
 
 Inst.
 
 152, 154.
 
 Zonch adm.
 
 101.
 
 Casaregis Disc.
 
 24
 
 n.
 
 24.
 
 Com. dig. admiralty. E.
 
 3.
 
 Buis. c.
 
 27.
 

 Admitting, however, (what to me seems utterly inad
 
 *450
 
 missible) that a neutral may lawfully ship his goods on hoard the armed ship of an enemy., it will be of little avail, unless he is exempted from the consequences of all the acts of such enemy. If the shipment be innocent, it «Hi be of little avail in this case, if the resistence of the enemy master will compromit the n'eutral character of the cargo. To the establishment, therefore, of sucli an exemption, the exertions of counsel have been strenuously directed.- It has been inferred from the silence .of elementary writers, from the authority of analagons. cases, and from the positive declarations of the Court, in the
 
 Catherina Elizabeth,
 
 5
 
 Rob.
 
 ,206.
 

 The argument drawn from the silence of Jurists lias been already sufficiently answered. It remains to consider that which is urged upon the footing of authority. The reasoning from supposed analagous cases is quite as unsatisfactory. It is not true, as to neutrals, that the act of the master never binds the owner of the cargo unless the master is proved to be the actual agent of the owner. The act of the master may be, and very often is, conclusive upon the cargo, although no general agency is established. Suppose he violate a blockade, suppress and fraudulently destroy ,he ship’s papers, or mix up under the same cover enemy, interests, will not the cargo share the fate of the ship ? The cases cited are mere exceptions to the general rule. They, in general, turn upon a settled distinction, that the act of the master shall not bind the cargo, where the act under the circumstances could not have been within the scope or contemplation of the shipper at the time of shipment; or where bis ignorance of the voyage, and of the intended acts of the master, is placed beyond the possibility of doubt.
 
 See Vie
 
 Moms, 5
 
 Rob.
 
 256. The very case of resistance is a strong illustration of the principle. The resistance of the neutral master, has been deliberately held to be conclusive on the neutral cargo.
 
 The Elzebe,
 
 5
 
 Rob.
 
 173.
 
 The Catherina Elizabeth,
 
 5
 
 Rob.
 
 206. What reason can there be for a different rule in respect to a belligerent master r
 

 It must be admitted that the language of the Court in the case of the Catherina Elizabeth would at first .view, seem to support the position of the Claimant’s.counsel. On a close examination, however, it will not be found to
 
 *451
 
 assert so broad a doctrine. The case was of a rescue attempted by an enemy master having on board a neu tral cargo; and this rescue attempted, not of the
 
 captured,
 
 but of the
 
 capturing,
 
 ship. It was arguen that this resistance of the master exposed the whole cargo, entrusted to his management, to confiscation. The Court held that no such penalty was incurred. That the resistance could only be the hostile act of a hostile person
 
 who was a prisoner of war,
 
 and who, unless under paroie, had a perfect right to emancipate himself by seizing his own vessel. . That the case of a neutral master differed from that of an enemy master. No duty was violated by such an acton the part of the latter;
 
 tupum auribus
 
 temo, and if he could withdraw himself he had a right so to do. $Jnd that a
 
 material
 
 fact in the case was, that the master aid not attempt to withdraw his property, but to rescue
 
 the ship.of tfe. captor
 
 and not his own vessel. Such was the decision of the Court, upon wlfich several observations arise. In the first place the resistance was not made previous to the capture ; and therefore whatever may be the extent of the language, it must be restrained to the circumstances of the case in judgment, otherwise it would be extra-judicial. In the next place it would be impossible to conceive how the fact, as to what vessel was seized, could be
 
 material,
 
 if the argument of the present Claimant be correct, for in all events the resistance as to the cargo would be without any legal effects. In the last place it is clear, that the case is put. by the Court upon the ground, that the master at the time of the act had been dispossessed of his vessel by capture, and was a prisoner of war. He was, therefore, ho longer acting as master of the ship, and had no further management of her. His rights and duties, as piaster, had entirely ceasfed by the capture, and there could be no pretence to affect the ship or cargo with his subsequent acts, any more than with the acts of any other stranger. The case would have been entirely different with a neutral master,
 
 whose relation to his ship continues notwithstanding a capture
 
 and carrying in for adjudication. The case therefore admits of sound distinctions from that at bar, and cannot be admitted to govern it.
 

 There is another text, not cited in the argument, which may be thought to favor the doctrine of the Claimant’s counsel. It is the only passage bearing on the subject in
 
 *452
 
 controversy which has fallen under my .notice in any elementary work. Casaregis, in his commercial; discourses, (Disc, 2%, n. 22) has the following remarks :k~
 
 “ Venim tamen notandum est quod, si navis inimica onerata mercibus■ mercatorum amicorum aggressa fuerit ah ft teram inimicam et viercatores ant
 
 domini mercium
 
 ope-en rani ac industriam dedissent pro éa aggvedienda tunc “ uierces dominorum . cadunt etiam sub prceda, si navis a predicta, oneyata niercibus' fuerit deproedata,
 
 <$*c. <J-c.
 
 et
 
 «<
 
 regulariter bona eorum qui auxilinm inimices nostris
 
 «
 
 preestani -vet confederad. cum iis sunt, prmlari poste sunt.”
 
 It is obvious that Casaregis is here considering the case of an attack of an enemy merchant ship, laden with a neutral cargo, upon the ship of its enemy in which the former is unsuccessful and is captured. Under such circumstances he hoids, that if the neutrdl shippers, or the persons leaving the management of the cargo
 
 (domini mercium)
 
 have aided in the attack, the cargo is forfeited, upon the ground that all who assist or confederate with an enemy are liable to be plundered by the law of war. He does not touch the case, where an enemy merchant ship simply makes resistance in her own defence, or resists the right of
 
 search;
 
 nor how far the master of such ship is the
 
 dominas mercium,
 
 or can by his own acts bind the cargo. Much less has he discussed the question as t.o what acts amount to an incorporation into the objects and interests of the enemy, so as to affix a hostile character. It does not seem to ine that his text can be an authority beyond the terms in which it is expressed. It pronounces affirmatively that a co-operation'in an attack will induce confiscation of the cargo, (which cannot be doubted,-) but it does not pronounce negatively that the resistance of an enemy master will not draw after it the same penalty. And if it were otherwise, it would deserve consideration whether, the opinion of a mere elementary writer, respectable as he may be, delivered at a time, when the prize law was not as well settled as it has been in the present age, should be permitted to regulate the maritime rights of belligerent nations.
 

 The argument then, on the footing of authority, fails, for none is produced which directly'points at circumstances like those in the case at bar. And upon principle it seems quite as difficult to support it. I am unable
 
 *453
 
 In .perceive any solid foundation on which to rest a dis-Unction between the resistance of a neutral and of an enemy master. The injury to the belligerent is in both cases equally great, for it equally withdraws the neutral property from the right of search, unless acquired superior .force. And until it is established that an enemy protection legally, suspends the right of search, .it cannot he that resistance to such right should not be equally penal in each party. I have, therefore, no difficulty .in holding that the resistance of the ship is, in all cases, the resistance of the cargo, and that it makes no difference whether she be armed or unarmed, commissioned or uncommissioned. He who puts his property on the issue of battle, must stand or fall by the event of the contest.' The law of neutrality is silent when arms art' appealed to. in order to decide lights
 
 ;
 
 and (he raptor 'is entitled to the whole prize won by his gallantry and valor. This opinion is not the mere inference, strong •as it seems to me to be, of general reasoning. It is fortified by the consideration that in the earliest rudiments of prize law, in the. great maritime countries of Great Britain and Franco, confiscation is applied by Way of penalty .for resistance of search to all vessels, without any discrimination of the national character of the vessels or cargoes. The black book of the admiralty expressly articulates that
 
 any vessel
 
 making resistance may be attacked and seized
 
 as enemies ;
 
 rnd this rule is"enforced in the memorable prize instructions of Henry VIII.
 
 Clerk’s Praxis
 
 164,
 
 Rob. Collect.
 
 Marit.'p. 10,
 
 and note, and p.
 
 118. The ordinance of France of 1584, is. equally
 
 broad;
 
 and declares
 
 all such' vessels
 
 good prize ,• and this has ever since remained a settled rule in the prize code of that nation.
 

 Vábn informs us that it is also the rule of Spain ; and that in France it is applied as well to
 
 French vessels .
 
 and cargoes as to those of neutrals, and allies,
 
 Coll. Mará,
 
 118,-
 
 Valin Traits des Prizes, eh. 5,
 
 §
 
 8, p. 80.
 
 There is not to be found in the maritime code of any nation, or in any commcntary.thercon, the least glimmering of authority that distinguishes, in cases of resistance, the fate of the cargo, from that of tiie ship. If such a distinction could have been sustained, it is almost incredible that not a single ray of light should have beamed upon it during the long lapse of ages, in which "maritime war
 
 *454
 
 fare has engaged the world. And if any argument is to be drawn from the silence of authority, 1 know not under what circumstances it can be more forcibly appliéd than against the exception now contended for.
 

 But even if it were conceded that a neutral shipper in a
 
 general
 
 ship might be protected, the concession would not assist the present Claimant. , His interests were so completely mixed up and combined with the interests of the enemy ; the master was so entirely his agent under the charter party, that it is impracticable to extract the case from the rule that stamps M[r. Pinto with a hostile character. The whole commercial enterprize was radically tainted with a hostile leaven. In its very essence it was a fraud upon belligerent rights. If, for a moment, it could be admitted that a neutral might lawfully ship goods in an armed ship of an enemy, or might charter such a ship, and navigate her with a neutral crew, these admissions would fall far short of succouring the Claimant. He must successfully contend for broader doctrines, for doctrines which, in my humble judgment, are of infinitely more dangerous tendency than any which Schlegel and Hubner, the champions of neutrality, have yet advanced into-the field of maritime controversy. I cannot bring my mind to believe that a neutral can charter an armed enemy ship, and-victual and man her with an- enemy, crew, (for though furnished directly by the owner they are?- in effect paid and supported by the charterer) with the avowed knowledge and necessary intent that she should resist every enemy/ that he can take on board hostile shipments on freight, commissions and profits/ thr.¿ he can stipulate expressly for the benefit and use of enemy convoy, and navigate during the voyage under its guns and protection ; that he can be the entire projector and conductor of. the voyage, and co-operate in all the plans of the owner to render resistance to search secure and effectual ; and that yet, notwithstanding all this conduct, by the law of nations he may shelter his property from confiscation and claim the privileges of an inoffensive neutral. On the contrary, it seems to me that such conluct is utterly irreconcileable with the good faith of a friend, and unites all the qualities of the most odious hostility. It- wears the hábiliments of neutrality only when the sword and the armour, of an enemy become
 
 *455
 
 «solees for defence. If it be, as it undoubtedly is, a violation of neutrality to engage in the transport service of the enemy, or to carry his dispatches even on a neutral voyage, how much more so must it he to inlist, all our own interests in his service, and hire his arms his crew in order to prevent the exercise of those rights which, as neutrals, we are bound to submit to ? The doctrine is founded in most perfect justice, that those wiio adhere to an enemy connexion shall share the fate of the enemy.
 

 On the whole, in every view which I have been able to take of this subject, I ám satisfied that the claim of Mr. Pinto must be rejected, and that his property is good prize to the captors. And in this opinion I am authorized to state that I have the concurrence of
 
 one of my brethren.
 
 It is matter of regret that in this conclusion I have the misfortune to differ from a majority of the Court, for whose superior learning and ability I entertain the most entire respect. But I hold it an indispensable duty not to surrender my own judgment, because a great weight of opinion iu against me, a weight which no one can feel more sensibly than myself. Had this been an ordinary case I should have contented myself with silence $ but believing that no more important or interesting question ever came before a prize tribunal, and that the national rights, suspended on it, are of infinite moment to the maritime world, I have thought it not unfit to pronounce my 'own opinion, diffident indeed of its fullness and accuracy of illustration, but entirely satisfied of the rectitude of its principles.
 

 Since this opinion was delivered I find, by an account of all the appeals, and final decisions thereon before the lords of appeal, published by order
 
 [of
 
 
 *443
 
 the house of commons in 1801, that the judgment of condemnation in the Sampson was afijrmed by the lords of appeal. The following is a transcript of the printed account: “ Sampson, 'Joshua Baraev, master; cargo, sugar, “ cofiec, cotton, indigo and dry goods, and specie, taken by his majesty’s ship' “ of war Penelope, Bartholomew Samuel Rowley, esq. commander, claimed. “ for American subjects for ship, eargo and specie — sentence appealed from - “ pronounced at Jamaica.22d April, 1794 — ship, caigo and specie condemn* “ ed. Sentence in the Court of Appeals, viz: 31st of May, 1798, sentence •' affirmed; as to the specie claimed on behalf of Wacksmuth and Outilli; “'and 21st of June, further proof directed to be made of the property of the “ ship, cargo, and rest of the specie. 29th June, 1799, ship, cargo and specie '‘.condemned.” ’