Mf. Chief Justice Marshall,-
 

 delivered the opinion pf the Court. This vessel was captured on- a voyage from- Bordeaux to Pensacola.by.the sloop of war Wasp, and sent into Savanna in Georgia, where she was libel-, led and condemned as prize of war. ’ The cargo was claimed for Mans. Foussat a French merchant residing at Bordeaux. In the district court the cargo was condemned as enemy’s property, avowedly on-the principle thitf. this character was imparted to it by'the vessel in which it was found. On Uri appeal to the circuit court, farther proof was directed, and this sentence was reversed, and restitution decreed tp the claimant. From this decree the captors appealed-to this court.
 

 It has .h,een contended, that this cargo ought to be condemned as enemy’s property,, because, 1st,(It whs found on board an armed belligerent.
 

 2d. It is, in truth, the property of British subjects.
 

 On the first question, the cáse does not' essentially differ from that of the Ner'eide. It is unnecessary to repeat the reasoning on which that case was decided 1 ° • the opinion then given by the three' judges is retained , . . . by-tnem. Ihe principle of the law of-nations, that the goods of a friend are safe in the bottom of an enemy, may be, and probably will be changed", or so impaired as to leave, no object to which it is applicable; but so long as the principle shall be acknowledged,, this court must reject constructions which render it totálly inoperative.
 

 2d. Respecting the proprietary interest, much doubt is entertained. In additioft to. the extraordinary fact of employing a belligerent carrier, while a neutral vaa
 
 *416
 
 sel belonging to the alleged owner of the- cargo lay in pbrt, there arecireumstances in this case calculated to
 
 r ■
 
 , « . Calcen suspicion, which the claimant ought to clear upj, so far as may be in his power.
 

 The return-cargo of the Atalanta-was to be in cotton, and Berkley,, Salkeld & Co., the owners, of the vessel, were also owners of large-cotton- plantations, the produce of which might be readily shipped from Pensacola. The papers show that the Atalanta sailed fiom Liverpool, where her owners reside, with a car* go for Bordeenlx, a part of which, about equal in value to the cargo taken in a? Bordeaux, belonged to Berkley, Salkeld, & Co., and that her ultimate destination,’, at the- time of sailing* was Pensacola, or the Havanna.
 

 Within a day or two after her arrival at Bordeaux, she-was chartered by the claimant for the voyage ¿a which she as chptured, and the cargo he now claims was put on board. A Mr. Prichard sailed in the vessel, who was a British subject, and who has b-’-ea represented in some of the testimony as a supercargo- .
 

 There are, undoubtedly, circumstances to diminish the- suspicion which must' be excited by those that have been mentioned. The proceedings have beren very irregular;"no examinations', in
 
 preparatorio
 
 have beer taken. - The captain, and probably the ■ mate with the alleged supercargo, were carried on board the .Wasp, and have perished at sea, and Mr. Foussat, whose character is unexceptionable* has sworn positively to his .interest. Yet, this interest can be, and therefore ought to be, proved by other testimony, and
 
 *417
 
 it. is in,the power ofMr. Foussat to explain, circumstances, which,.as- they now appeár, cannot be disregarded. The court,, therefore, requires farther proof, which Mr. Foussat is allowed to produce, to the follow* ing points:
 

 1st. To his proprietary interest in the cargo. To show how and when it was purchased.
 

 2d. To- produce his correspondence w’th Barclay,, Salkeld & Co., if any, respecting this voyage-.
 

 3d. To explain the circumstances relative to the original destination- to Pensacola, when ¿he- Atalan* ta sailed from Liverpool.
 

 4th. To explain the character of Mr. Pritchard., and his situation on board the Atalanta.
 

 5th. To establish the genuineness of f.iie letter of ,the28th-of August, and say by what Vessel it was-sent.
 

 6th. -To show to whom that part of the cargo of the ' Atalanta,on the voyage from Liverpool to Bordeaux, which belonged'to Barclay, Salkeld & Co., was con. signed, and how it was disposed of.
 

 7th. To produce copies of the letters of Barclay, Salkeld & Co. relative to this- transaction, or account for their non -production.
 

 Mr. Justice Johnson.
 

 When this cause was cpnsfc dered in the court below, I entertained great doubts on, the subject of the proprietary interes . But those doubt» have here been satisfactorily cleared up. I am now satisfied,.-that no inference-unfavourable, to the claim can fairly be drawn from the circumstance, of this
 
 *418
 
 cargo being laden on board an armed belligerent; It it had been intended to throw a. jveil of neutrality ever hostile property, it is more probable that a neutral carrier would have been used than a
 
 belligerent'T
 
 arid as to the dangers supposed to have been, unnecessarily incurred, of being cáplpred and turned away from the destined market, it is more than probable that á chance of being Captured and carrie4 into, an American port, so far from being prejudicial to the adventure, would have enhanced its profits. The claimant, then, if conscious of his inriocenee, had' no evil to apprehend from capture; on the contrary as the cargo was calculated for'an American market, it might in, case of capture, kave reached its destination directly; whereas, if -it had arrived at Pensacola, its route would have been more circuitous. With, regard to the fact, that-the voyage in its inception, was destined to. ¡^ensacóla, that I think also satisfactorily explained. It was in strict pursuance of her original destination ; on her'arrival at Bordeaux she was put -up for Pensacola, and chartered by. this- claimant for the voyage. The instructions to- the captain show that it was not fixed, whether, on her return voyage, she shduld be laden on owners’ account, or not; and it probably-depended upon the .contingency of her being taken up at Bordeaux for.a return freight. As to the facts that Pritchard, the supercargo to Bordeaux, continued in that capacity on the voyage to Pensacola ; that Ramez, the consignee, was the agent of the ship-owner ; and .that the present cargo was purchased.with the freight ana cargo to. Bordeaux, lam, now, satisfied that they are unsupported by the
 
 *419
 
 .Yider.ee. That Pritchard should continue to be designated by the appellation of supercargo among the crew was to be expected from his having been known among them by that epithet on the Voyage to Bordeaux, and that Ramez, who had been recommended to Sal-keld, Barclay & Co,, for his integrity by their agent,- should be by them, or by some other, recommended to the patronage of Foussat, was perfectly consistent with ordinary mercantile intercourse-; and in the total absence of proof, that the freight, or proceeds of the outward cargo of the ship ever came to the hands of Foussat, there is no. sufficient reason for conjecturing that the cargo laden on board for Pensacolh was purchased with those funds.
 

 I am¿ therefore, of opinion, that the proprietary interest is sufficiently established. But, as the proprietary interest is altogether immaterial, if lading a. neutral cargo on board an armed belligerent is,
 
 per
 
 se, a ground of condemnation, it becomes necessary to consider that question.
 

 It has long been with me a rule of judicial pro • ceeding, never, where I am free to act, to decide more in any case than what the case itself necessarily requires ; and so far only, in my- view, can a case be considered as authority. Accordingly, when the case of the Nereide was before this court, I declined expressing my opinion upon the general question, because the cargo, considered as Spanish properfy,' was e&posed to capture, by the Carthagenian and other privateers, and considered as belonging to a revolted colony, was liable to Spanish capture. 'The neutral shipper, therefore, could not. be charged with
 
 *420
 
 evading our belligerent rights, ór putting off his neutral character when placing himself under the protection of an armed belligerent, when sailing, as that «hipper was, between Sylla and Charybdis, he might accept of the aid or protection of one belligerent, without giving just cause of offence to another!
 

 But a case now occurs of a vessel at peace with all the world ; and to give an order 'for farther proof without admitting the rule, that-lading a neutral cargo
 
 bn
 
 board an armed belligerent is not,
 
 ner se,
 
 a cause ■of forfeiture appears -to .me nugatory.
 

 It is true, this is not a case of a commissioned or cruizin g vessel, and I have no objection to reserving the question on such a case until it §hall occur, if ij can he done consistently with the principles upon which I found my-opinion
 
 ;
 
 but in my view, -there is no medium, and no necessity fpr a belligerent te insist on any- exception in his favour. • On the contrary., I consider all the evils as visionary that are dwelt upon as the result'of thus extending -this right in favour of neutrals. No nation can be powerful on the pcean that does not possess an extensive commerce-; and if her armed ships are to be. converted into carriers, (almost, I would say an absurd supposition,) . fear own commerce, would ' have, the preference .\ so-that the injury could never be of any real extent. But should it be otherwise; what state of things ought one belligerent more devoutly to desire than that thé whole military marine of her enemy should he so employed, and bound down to designated voyages, from which they were not at liberty to deviate.? . It weiRtl be curious to see a government thus involving
 
 *421
 
 itself with merchant,shippers in question's of affreightment, assurance, deviation, average, and so
 
 forth;
 
 the possibility may .be imagined,- but the reality will never-exist.
 

 The general rule in,this case, it will be observed, is controverted by no one ; nor is it denied that it is incumbent on the captor to maintain the exception cop-tended for. • It is for him to prove,, that the acknowleaged right of the neutral to employ a belligerent carrier does not include the right of employing an.'
 
 armed
 
 belligerent, carrier.
 

 In order to support this proposition, arguments áre usually adduced, from the silence óf Writers Upon the subject; from decisions in analogous Cases-; and from its general inconsistency with thq belligerent right of search or adjudication.
 

 If it be asked, why have- writers, and particularly the champions of neutral rights been ■ silent, on this subject'?- .1 think the answer obvious. Practically it is .of very little general importance either to neutrals or belligerents, and those who are more disposed to favour belligerent claims would naturally avoid a doctrine which they ' could not maintain, whilst all who* wrote for the benefit of those who are to read would-avoid swelling their volumes with unnecessary discussions, or raising phantoms, fpr •• the. amusement of. laying them. The silence of . the -world upon the subject is, to my mind, ■ a sufficient evidence thaf public sentiment is against it. It is impossible, buf that in the course Of the long and active naval wars of the last two centuries,. cases1 rniust have pc«urted in which it became necessary- to consider this
 
 *422
 
 question; and fhough.it had escaped the notice of jurists, it must have been elicited by the avariqe of captors, the ingenuity of procter's, or the learned researches of courts of prize. Yet we find not one.case on record
 
 of
 
 a condemnation as, prize of warvon the ■ground Of argument, nor a dictum in any of the books that suggests such an exception. But the rule itself is laid down everywhere-; and in ray view, laying down the rule without-the exception, is in effect a negative.to-the exception.
 

 But it is not true that this subject'has altogether escaped the notice of Writers on the law of prize# There is on record one opinion On this subject, and that of great antiquity ahd respectability, and which may nave given the tone to public opinion, and thus account for the silence of subsequent writers : I allude to the dictum extracted from Casaregis,- in which the author asserts, “ that if a vessel laden with neutral merchandize, attack another vessel,, and be captured,. her cargo shall not be made prize, unless the owner of the goods, or his supercargo, engage in the conflict” Nowj if an actual attack shall not subject to forfeiture, much leis shall arming for defence.; and it is fairly inferrable from the’ passage ihat the author had iff his view, the case of an armed belligerent.carrier, or he would not. have represented her as the^attacking vessel.
 

 But it is contended, that decisions have taken place in the courts' of other states, in.analogous cases, which cárínot be reconciled with the principle On which the claimant rests his defence. On this sub ject.I will make ope general remark: I acknow
 
 *423
 
 ledge no decision as authority in this,court but the decisions of. the court, as far as necessary to ihe case decided; and the decisions of the state courts as far as they go to fix the landmarks of property; and, generally, the
 
 Ua. bci
 
 of the respective states. All other decisions I will respect for as muchasihey are worth in principle.
 

 The decisions relied orí id this part of the argument are those by which neutral
 
 vessels
 
 under
 
 neutral
 
 convoy, were condemned for the unneutral act of the convoying vessel; and those in which neutral
 
 vessels
 
 have been condemned for placing
 
 themselves.>
 
 under protection of a
 
 hostile
 
 convoy. With regard to the first clafes of cases, it' 'is very well known; that they originated in, the capture of the Swedish convoy,'at a time, when Great Britain had resolved to throw down the glove to all, the. world bn the principle .of. the northern confederacy. It was, • therefore,‘ a measure'essentially hostile. But independently of .this, there are several, considerations which present an obvious distinction between both classes of cases and this,under consideration- A convoy is an association for a hostile object, fio undertaking it, a na-. tion spreads over'the merchant vessel an immunity from search, which belongs only to a national ship; and by joining a convoy, every individual ship puts, off her pacific character, and undertakes for the dis* charge of duties width .belong only to the military marine, and adds to the numerical, if not to the redi; strength of the convoy. If, then, the association be voluntary, the neutral, in suffering the fate of-the whole; has ouly to regret his own- folly fn wedding.
 
 *424
 
 bis fortune to-theirs; or if involved is the aggression’ ot opposition of the convoying vessel, he'shares the fate which the leader of his own choice either, was,, or would have* been made liable to, in-case.-of capturé; To elucidate this idea let us suppose the case of an. individual, who- voluntarily fills up the ranks of an. enemy, or of one-who only enters upon the discharge of those duties in war which would otherwise take men from the- ranks; and the reason will be obvious why he should he treated- as. a prisoner of war and involved in thé fate of a conque'red enemy. But it is not so with the goods which constitute the lading-of a ship; those give neither real nor numerical strength-to an enemy, but rather embarrass and impede him; Ahd even ij"it be admittc that, in all cases, a.cargo* should be tainted with the otfenee of the carrying vessel,' it will be- Seen that the reason upon, which those eases profess to proceed is not applicable to- the case .of neutral goods on board of a hostile carrier. Resistance, either real or constructive, by a neutral carrier, is, with a view to the law of nations, unlawful; hut not so with the hostile carrier, she had a right to resist, and-in her casé, therefore,. ere is no offence committed toéommunicate a taint to her cargo.
 

 But it is contended that the right to use a hostile, itrmed: carrier,' is inconsistent with the -belligerent’s-tight of search, or of capture, or of adjudication;, for fen this point the argument is not very distinct, though I.plainly perceive it must be the right .of adjudication,, if any, that is impaired. The right of capture' ápplies. drily to enemy ships, or gfepds; the right of search to
 
 *425
 

 Memy goods
 
 on board a
 
 neutral
 
 carrier; and therefore it must he the-right-of adjudication that is supposed to fee impaired, which- applies to the case of gopds found either
 
 ofi
 
 board of a neutral' or belligerent; and this mere
 
 scintilla -juris
 
 is at last the real basis-upon which the exception contended for must rest. But in what manner is this right of adjudication impaired? The-neutral'does not deny the right of the belligerent to decide the question of proprietary interest.. If it be-really neutrai, of what consequence-is it to the bellig-' éreút who is the carrier? He has no right to capture-it; and if it be
 
 hostile
 
 covered as
 
 neutral,
 
 the belligerent is only compelled to do that which he must do in all ordinary cases, subdue the >,ship before he gets the cargo. It cannot be expected that the belligerent will rest his complaint upon the humiliating ground of his inability to-subdue his enemy; and if he should,-the neutral may well reply it is his affair or his misfortune, but ought not in any of its consequences to affect the-rights of the neutral. Nor is it at. all certain that landing on board an enemy carrier is done at all times with.an intent to avoid capture;,it may be to solicit it; as in the-case-of-the late war,- when British goods,, though neutral owned, could only be brought into' our-market through the- medium of capture. There, instead of capture being a lisk of the voyage, it was one of the- chances of profit. And the hostile carrier may have been preferred to-the .neutral, with the express' view .pf increasing the- chance- of .capture.
 

 When we come to analyze-, and apply the ar^i
 
 *426
 

 mentsi.
 
 o-f the defenders of this exception, I .think
 
 it
 
 will be found that they expose rhernselyes to the impu,~ Nation of'unfairne>s, in professing to sustain an except tion,- when they.'mean to aim á blow at the whole neutral right of- using a belligerent carrier; or they do not follow up their reasoning in its consequences, so as to . he sensihle of the result to which it leads. ' The exception which exhausts the principal rule must be incorrect, if the ■ rule itself be admitted asá correct one; it is, in fact, air adverse proposition, and it appears to demonstrate that all the arguments urged in favour of the exception, now under consideration, if they prove anything, prove too much, and obviously extend.to the utter extinction of the rule itself, or the destruction of every beneficial' consequence that the neutral can. derive from it. Thus, if it be unlawful to employ an armed belligerent carrier, then what'proportion, of ar-mament or' equipment will render it unlawful ?. , Re-tween one gun and one hundred, the difference is only in degree, hot in principle; and if ft is leftto the courts, of the belligerent .to apply the exception to successive cases as they arise, it’«evidently becomes a. destroying principle, which will soon consume the vitals of the rule. And the neutral will soon consider if as. a snare, not a privilege,.
 

 . Again ^the proposition is that the neutral may employ a hostile carrier; but the indispensible Attributes qf a state of hostility are the right of armainent, .of defence, of attack, and of capture ; if then you strip the belligerent of any one, or more of these characteristic», the popositjon is- falsified, for he can no longer
 
 *427
 
 Ire called'' a hostile carrier; he assumes .an amphibi«us anomalous character, for which there is no epithet applicable unless it be that of semi-hostile. And what becomes of the interest of the neutral? It is mockery to hold out to him the right- of employing a hostile carrier, when you attach to th,e exercise of thaj right consequences, which would make it absurd for1 a belligerent to enter into a charter party with bit». If resistance, arming, convoying, capturing, be the acknowledged attributes ánd' characteristics of Oie belligerent, then deprive him of these- attributes, and you reduce him to a state of neutrality, nay) worse than a state of neutrality ; for he continues liable to • all the danger incident to the hostile character, without any of the rights which that character cohfers upon him. What belligerent could ever be induced to engage in the transportation of neutral goods,if the consequence of. such an undertaking bfe that he puts off his own character, and assumes that of the neutral, relinquishes his right of arming, or r'esistingj without acquiring the-immunities or protection of the neutral character.. It is holding out but a shadow Of a benefit' to the neutral.
 

 Some confusion is thrown over this subject by not discriminating carefully between the ,cases where a
 
 neutral
 
 shipper, and a
 
 hostile
 
 carrier, are the parties-td the contract,1 and those in which both
 
 shipper
 
 and
 
 carrier
 
 are hostile'. In the latter case, the carrier,‘ when armed, may fairly- be .-understood, to have undertaken to fight, as wéll as to carry. But when a neqtral is the shipper, the carrier, (independently of specific contract,) is left to .fight, or not, áé he shall dee»
 
 *428
 
 prpper. Thus, if a neutral shipper charter an unarm' ed belligerent, he would not be released from his contract, shQuld the belligerent put arms or men into his ship,, otherwise taking ordinary and prudent precaution for the safety of his vessel, • precautions which would ih general lessen -the’ 'insurance on the cargo itself, would be á violation of thé. master’s contract. And.on the other hand, a belligerent master would,be under..no.obligation to the neutral to fight, if met by an enepiy on the ocean, even though particularly re(jjujred hy the nbutral shipper. There is then nothing in. that argument which is founded on the supposition that the neutral'is assisting in expediting a naval hostile equipment, when he employs .a belligerent carrier ; on the contrary, hé either embarrasses the belligerent in,, or detaches him from, the operations of war.
 

 It makes no difference in my view, whether the.right of. using a hostile carrier, be-considered as a voluntary concession in behalf of neutrals, or as a conclusion from’those principles, which form the basis of internar Upna¡l Jaw. We find it eminating from the same ♦puree as thé right of search and ¿adjudication, and .it is of equal authority. If in practice it should-ever be fpund materially detrimental to acknowledged national tights, it may be disavowed nr relinquished; or should our'own legislative power.evér think proper, to tie-. Clare against, the right,, it can impose the law upon jt? own courts. But until it shall beso relinquished,, or. abrogated, we are bound to ápply'it with all. .the ¡beneficial consequences that it was intended to produce.
 

 I dp not, however, .consider it as.a.mepe voluntary
 
 *429
 
 -concession in favour of neutral commerce. Were t now¿ for the. first time, made a question whether a neutral-should be permitted to usé a hostile carrier, I should not hesitate to, decide that it would be exr •eeedingly harsh and unreasonable to deny to the neutral the exercise of such a! right. The laws of war and of power, already possesses sufficient advantages over the claims p'f the weak, the. wise, and. pacific. Iam, . in .sentiment,' opposed ■ to 'the extension of belligerent fights. Naval warfare, as sanctioned by the practice of the world, I consider as the disgrace of modern ■civilization. . Why should private plunder degrad® • the privileges of a naval commission? It. is ridiculous at this day, to dignify the practice with.the-! epithet. of reprisal. If it be reprisal, we may .c.aim all the benefit of the example of .the savages in ouir forests, to whom the practice is familiarly known, hut -we must yield to them in the reasonableness of it® application, for they really do apply the thing taken, to indemnify the' party injured. The time was when war, by. land and by sea, was carried.on upon the. Same principles. The good sense of. mankind has. . lessened its horrors on land, and .it is scarcely possible to find any sufficient reason why an analogous reformation should not take place- upon the ocean. ,Tbe present time is the most favourable that has ever occurred for effecting this .desireable change. There is U power organized upon the continent of Europe that may command 'the gratitude' and veneration of posterity by determining on this reformation. It- 'must .tike effect when théy. resolve to enforce if.,
 

 
 *430
 
 We find the law 'of nations unfortunately embarras-. Sed. with the principle that it is lawful to impose a direct- restraint upon the industry and enterprjze of a neutral; in order to produce an incidental embarrassment to an enemy. In its original, restricted application, this principle was of undoubted correctness, and did. little injury ; but in the modern extended usewibiich has been made of it, we see an exemplification of the difficulty of restraining a belligerent in the application of a convenient principle, and an apposite illustration. of one of the objections to admitting the exception unfavourable to the use of an armed hostile carrier. But surely there must be some limit to the exercise, of this right by a belligerent. And it
 
 id
 
 incumbent upon him to show that the restraint imposed upon the neutral, is indispensable to the exercise of his own acknowledged right, or the punish;mént inflicted on him to be justly due to the violation of his neutral obligations. Now, what violation
 
 of
 
 "belligerent right, ór neutral obligation, can result from the employment of a hostile--carrier ? If employed to break a. blockade, Carry goods that are contraband of war, or engaged in other illicit trade, the goods are liable to condemnation, on principles having no relation to this case.. B,utif employe I in,law,fill commerce, where is the . injury done to the belligerent ? There is no partiality exhibited on the part .of the neutral; for the belligerents .are necessarily excluded from each others, ports, and-cannot be employed, except, each in the commerce of his own country; and. •o far from violating any belligerent right, thje peu
 
 *431
 
 taal tempts the ship of the enemy from a place of safety to expose her to . hostile ■ capture, or -detaches her from warlike .operations,.and engages her in purSuits-less detrimental to the interest of her enemy, than cruizing or 'fighting. To the'neutral the right of employing a hostile carrier may be of vital importptpje.. The port of the enemy may be his granary ; he.may have no ships of his. own, no.other.carrier maybe found there; no other permitted to be thus, employed,,or no other serve him as faithfully, or. onas good terms. So, also, with regard to the produce of hits own industry, his .only taarket may be in the port pf one of the belligerents', and his only means Ot access to it .through the use. of the carriers of that port,
 

 A case has been referred to in the argumeiit ; the case of the Fanny in
 
 Dodson’s Reports;
 
 in which the court of admiralty in England granted salvage upon gpods shipped On' board an armed enemy carrier captured-by án American Privateer,-, and "re-captured by the British. The ground on which the court, professes to proceed, according'to the report, is'that these goods, were in danger of
 
 being .
 
 condemned in our, courts,' on the ground that the shipper had quit the ’ protection of his neutrality, and resorted to the pi oteetion, of arms.
 

 Had t.he question decided in that case been one of forfeiture, and not of salvage, that decision would have been in point. But even then I should have claimed the privilege exercised by the learned judge who presides in that court with so much usefulness to. hist country, and honour to himself, of founding my Own'
 
 *432
 
 opinions upon my own researches and resources. Should a sithilar cas,e ever again occur in' that court, and- the decisions of this court have passed the Atlantic, that learned judge will-be called on to acknowledge fhat’thé danger of condemnation was not as great as' he- had imagined; and that independent of the question' agitated in this case,, this court would have'had respect to the embarrassing, state of warfare in which the people of Buenos Ayres were involved, and adjudged that the prepauti'ons for defence ■Were intended against their enemies rather than their friends; With regard to the award of salvage, it is Wélí known1 that the grant of.salvage upon the recaption of a neutral was the favourite offspring of that' judge’s administration; until then no' contribution had been levied upon-neutral commerce- to give* activity to hostile enterprise. - When a question of’salvage on such a recapture'shall occur in this court those adjudications will'come under review : but this case eartnot be considered in- point until this court is caHed on tb decide whether the British®example shall prevail, or the obvious dictate of reason, that the neutral should be liberated and permitted to pursue his voyage, qr at least to decide for himself in which of' the belligerent.' courts his rights will be most secure.
 

 Upon the whole, I am fully satisfied that the decision in the.'case of the Nereidé, was founded .in- the most correct principles, and recognize the rule, that lading on board an armed belligerent is not,
 
 per
 
 re, a carme óf forfeiture ;. as not only the most correct
 
 *433
 
 on principle, but the most liberal and honarable tb the jurisprudence of this country,-.
 

 Farther proof ordered.
 
 a
 

 a
 

 Mr. Justice Ton» and Mr. Justice DüvALE'did not sit in-this cause.